81 F.3d 570
 Prod.Liab.Rep. (CCH) P 14,625
 In re AIR DISASTER AT RAMSTEIN AIR BASE, GERMANY, on
8/29/90, Plaintiff.
Olga PEREZ, etc., et al., Plaintiffs-Appellants,
v.
LOCKHEED CORP. and General Electric Company, Defendants-Appellees.
 
 No. 95-50091.
 United States Court of Appeals,
Fifth Circuit.
 April 29, 1996.
As Amended on Denial of Rehearing and Rehearing En Banc July 5, 1996.
 Ralph Oliver Anderson, Mark W. Hicks, Gary Allen Magnarini, Hicks, Anderson and Blum, Miami, FL, for all plaintiffs-appellants and intervenors plaintiffs-appellants.
 James Teague Crouse, Speiser, Krause and Madole, San Antonio, TX, for all plaintiffs-appellants.
 Robert L. Parks, William L. Petros, Anderson, Moss, Parks and Sherouse, Miami, FL, for all Perez parties.
 Charles F. Krause, Speiser, Krause & Madole, New Orleans, TX, for Ofelia Wilson, plaintiff-appellant.
 Ronald D. Krist, Krist, Gunn, Weller, Neumann & Morrison, Houston, TX, for Barbara J. Knutson, intervenor plaintiff-appellant.
 James D. Guess, Groce, Locke & Hebdon, San Antonio, TX, for Lockheed Corporation.
 Ron A. Sprague, Neil Howard Stone, Thomas Walter Gendry, Robert Mathy Lair, Gendry and Sprague, San Antonio, TX, for all defendants-intervenors defendants-appellees.
 D'Anne Keller Haydel, Edward John O'Neill, Jr., Kelly J. Kirkland, Clements, O'Neill, Pierce & Nickens, Houston, TX, Paul K. Holloway, Porter and Hedges, Houston, TX, Jerry L. Mitchell, Kasowitz, Hoff, Benson and Torres, Houston, TX, Francis A. Anania, Miami, FL, for General Elec. Co.
 Appeal from the United States District Court for the Western District of Texas.
 Before POLITZ, Chief Judge, and GOODWIN[1] and DUHE, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Plaintiffs, bringing product liability claims arising out of a fatal crash of an Air Force C-5A in Germany, appeal the summary judgment in favor of defendants, Lockheed and General Electric. We affirm.
 
 I. BACKGROUND
 
 2
 The crash occurred approximately 17 seconds after takeoff from Ramstein Air Base in Germany on August 29, 1990. Thirteen of the seventeen servicemen aboard the aircraft were killed. Plaintiffs sued on theories of manufacturer's liability based upon Georgia state law failure to warn, breach of warranty and gross negligence.
 
 A. The Crash Aircraft
 
 3
 The C-5A was designed, manufactured and delivered to the Air Force pursuant to a government contract with Lockheed Corporation.[2] Although the original procurement contract may have contained only general specifications, the actual development of the C-5A resulted in detailed specifications designed by both the defendants and the Air Force. Lockheed subcontracted with General Electric to design and manufacture engines for the C-5A.[3] General Electric manufactured and designed the thrust reversers in Ohio. Lockheed installed the General Electric engines into the C-5A and conducted the remainder of its work on the C-5A in Georgia. The first C-5A was delivered to the Air Force, in Georgia, in 1971. The crash aircraft was maintained at Kelly Air Force Base in San Antonio, Texas, but flew missions all over the world.
 
 B. Modification of the Crash Aircraft
 
 4
 From time to time, the C-5A, including the crash aircraft, has undergone modifications based on recommendations from the Air Force and from Lockheed itself. The modification relevant to this case was made pursuant to Engineering Change Proposal ("ECP") 7054. As requested and agreed to by the Air Force, the purpose of ECP 7054 was to reconfigure the engine pylons to maximize the separation of flammable substances from ignition sources. This reconfiguration also involved the relocation of the ground stud whose failure allegedly caused the accident. Importantly, however, the relocation of the ground stud did not change the original design of the circuit. Lockheed designed and manufactured a kit, based on ECP 7054, that was used to retrofit the pylons on all C-5As. The Air Force was to begin taking delivery of these kits in 1981. The Air Force, and not Lockheed or General Electric, installed the kits on the aircraft.
 
 
 5
 C. Air Force Involvement in the Design and Manufacture of the C-5A
 
 
 6
 The Air Force was at all relevant times, and still is, closely involved in the design, manufacture and maintenance of the C-5A. The Air Force directly participated in the design of nearly every part of the aircraft. In the instances where the Air Force was not directly involved, it approved the designs after reviewing them in detail with the relevant personnel of the defendants. As the planes were being manufactured and developed, the Air Force required Lockheed to put the various components through rigorous testing to ensure that all of the contract specifications had been satisfied. The Air Force reviewed and approved these tests. The Air Force did not merely "rubber stamp" the tests and data, but placed its officers on site to observe the development and manufacture of the C-5A, including the electrical circuit design at issue in this case. Once the planes were built, the Air Force and Lockheed conducted joint tests before putting them into active military service.
 
 II. PROCEDURAL BACKGROUND
 
 7
 Seven separate lawsuits were filed in Texas and Florida state courts. Representatives of eleven of the decedents and one of the survivors filed products liability lawsuits asserting claims based on strict liability, negligence, negligent failure to warn, breach of warranty, and gross negligence in the design, manufacture and marketing of the C-5A aircraft.[4]
 
 
 8
 The plaintiffs theorized that the aircraft crashed because of an uncommanded and undetected deployment of the thrust reverser on one of the two engines on the left side of the aircraft. The plaintiffs alleged that this deployment was caused by the defective design and manufacture, or modification, of the electrical system contained in the pylon (the component that attaches the engine to the wing). Although the plaintiffs' brief characterizes this as "one of the theories of liability" it is the only one mentioned in the record.
 
 
 9
 The electrical system was configured so that the circuit that sends the signals to deploy or retract the thrust reverser, the "enunciator", and the circuit that sends signals back to the cockpit control panel, the "indicator", were grounded by physical attachment to the same ground stud. The plaintiffs believe, but offered no proof, that this ground stud failed, causing a single point electrical failure, and simultaneously disabled both the enunciator and indicator circuits, making it impossible for the crew to know that the thrust reverser was deployed.
 
 
 10
 The defendants, on the other hand, contended that the accident was caused by crew inattention.
 
 
 11
 The defendants removed all of the lawsuits to federal district courts in Texas and Florida on the basis of diversity jurisdiction. The Judicial Panel on Multidistrict Litigation, pursuant to 28 U.S.C. § 1407, transferred the cases to the Western District of Texas for pretrial proceedings because most of the plaintiffs are Texas residents and many relevant documents and witness were located at Kelly Air Force Base.
 
 
 12
 The district court, applying Texas conflicts-of-law rules borrowed from the Restatement (Second) of the Conflicts of Law, held that Georgia substantive law, instead of Texas law, governed the dispute. The court granted summary judgment in favor of the defendants on all of the plaintiffs' claims based on the original design of the electrical system in the pylons, and the pylon kit modifications, because they were time barred by Georgia's statute of repose.[5] (Memorandum and Order of July 14, 1994 and Memorandum and Order of January 6, 1995, respectively). The court also applied the statute of repose to the plaintiffs' failure to warn claim because there was no evidence that the defendants had actual knowledge of any danger that the system may have harbored.[6] The court rejected the plaintiffs' breach of warranty claims because no privity of contract existed between the parties as required under Georgia law. Finally, the court rejected the claim based upon allegations of willful, wanton and reckless misconduct (gross negligence) because the plaintiffs offered no evidence to support recovery under this theory. The court did not rule on the defendants' government contractor immunity defense because at the time it was presented the plaintiffs had not sufficiently articulated what they thought was the cause of the accident. Therefore, the court could not make the necessary factual findings to determine whether government contractor immunity applied. See Memorandum and Order of November 14, 1994 at 13. The court considered the defenses based upon the statute of repose, and the lack of any duty to warn the Air Force of obvious design characteristics in which the Air Force had participated as sufficient grounds to grant summary judgment.
 
 
 13
 Plaintiffs' timely appeals were consolidated by this Court sua sponte.
 
 III. GOVERNMENT CONTRACTOR IMMUNITY
 A. Standard of Review
 
 14
 We review the grant of summary judgment de novo. FDIC v. Ernst & Young, 967 F.2d 166, 169 (5th Cir.1992). Once a motion for summary judgment has been properly made, the burden shifts to the nonmovant to go beyond the pleadings and by his or her own affidavits, depositions, answers to interrogatories, or admissions to come forward with specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Fed.R.Civ.Proc. 56(e).
 
 
 15
 Although, as noted, the district court did not specifically rule on government contractor immunity, that defense is properly briefed in both the trial court and this court. All the depositions and affidavits relevant to the defense were before the court at the time of its final ruling. We hold that the contractor immunity defense was itself a sufficient basis for summary judgment with respect to all claims, except possibly the "failure to warn" claim. We are obliged, moreover, to affirm a correct decision for any appropriate reason supported by the record. Pitts v. American Sec. Life Ins. Co., 931 F.2d 351, 357 (5th Cir.1991).
 
 
 16
 B. The Boyle Test for Government Contractor Immunity
 
 
 17
 In Boyle v. United Technologies Corp., 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) the Supreme Court wrote that
 
 
 18
 [l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. Id at 512, [108 S.Ct. at 2518].
 
 
 19
 The Court explained that government contractor immunity is derived from the Government's immunity from suit where the performance of a discretionary function is at issue. Id at 511, 108 S.Ct. at 2518 (citing the Federal Tort Claims Act, 28 U.S.C. § 2680(a)).[7] The Court concluded that "the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function." Id at 511, 108 S.Ct. at 2518.
 
 
 20
 The first two elements of the test ensure that the Government, and not the contractor, is exercising discretion in selecting the design. The third element is necessary to eliminate any incentive that this defense may create for contractors to withhold knowledge of risks. Id., at 512, 108 S.Ct. at 2518.
 
 
 21
 1. The Air Force Approved Reasonably Precise Specifications
 
 
 22
 In Stout v. Borg-Warner Corp., 933 F.2d 331 (5th Cir.1991), this Court enumerated some of the constituents of "reasonably precise specifications" and government approval of those specifications for the purposes of satisfying the first element of the government contractor immunity defense. We held that the government contractor immunity defense is available where "review [of the project] involved, inter alia, [the contractor's] submission of detailed drawings at various progressive stages of the design, critical design reviews where Army engineers' critiqued [the contractor's] work, and, finally, the production of prototype models tested and evaluated for months by the Army for its actual performance." Stout, 933 F.2d at 336. See Trevino v. General Dynamics Corp., 865 F.2d 1474, 1480 (1989) (if government engages in meaningful review of design the first element of Boyle test is established); see also Kleemann v. McDonnell Douglas Corp., 890 F.2d 698, 701 (4th Cir.1989) ("It is this salient fact of governmental participation in the various stages of the aircraft's development that establishes the military contractor defense."); Harduvel v. General Dynamics Corp., 878 F.2d 1311, 1320 (11th Cir.1989) (requirement that government approve reasonably precise specifications is met where contractor incorporated design that government subsequently reviewed and approved).
 
 
 23
 In this case, the Air Force's substantive review, evaluation and testing of the C-5A clearly implicates the Government's discretionary function and approval of reasonably precise specifications. The defendants included with their motion for summary judgment unrebutted affidavits declaring that Lockheed, General Electric and the Air Force worked closely together on the development of the C-5A from its planning stages to its full production. In addition, the Air Force, through its personnel, inspected and supervised every aspect of the production of the C-5A. Clearly, the approvals in this case go far beyond mere rubber stamping. See Trevino, 865 F.2d at 1480 ("When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion"). In this case, the Government did not leave "the critical design decisions to the private contractor," but worked closely with the defendants every step of the way. Trevino, 865 F.2d at 1480.
 
 
 24
 2. The C-5A Conformed to the Reasonably Precise Specifications
 
 
 25
 The plaintiffs argued that the C-5A did not conform to the original design specifications because "[w]hat the Air Force chose in the C-5A procurement program was a failsafe performance specification...." According to the plaintiffs, the design of the circuit was not failsafe because a single point electrical failure, such as the one alleged to have occurred, could result in an accident. However, such a general design specification is not contemplated by the first element of the Boyle test because "[o]nly the detailed, quantitative specifications--and not those calling for such vagaries as a failsafe, simple or inexpensive product--are relevant to the government contractor defense." Kleemann, 890 F.2d at 703 (4th Cir.1989).
 
 
 26
 The defendants introduced evidence showing that the Air Force inspectors were present and actively involved throughout the design, review, development and testing of the C-5A. Furthermore, the evidenced showed that the Air Force accepted and has used the C-5A for over 20 years without any significant problems. From this evidence the district court could have concluded that the C-5A was built in accordance with Air Force specifications. See Smith v. Xerox Corp., 866 F.2d 135, 138 (5th Cir.1989).
 
 
 27
 In an attempt to rebut the defendants' evidence, the plaintiffs included affidavits and other exhibits describing the general process of military procurement for military aircraft, such as the C-5A, where the Government has very little to do with the actual design and development of the plane. However, none of that information specifically addresses the actual development of the C-5A; the information describes only how procurement was to work in theory. This background information, while interesting, is of no legal relevance because it does not rebut the defendants' highly specific information about the actual development of the C-5A.
 
 
 28
 3. Warning of Dangers not Known to the Air Force
 
 
 29
 Finally, the plaintiffs argue that the defendants did not warn the Air Force about the dangers created by the design of the electrical circuit. The defendants had a duty to warn the Air Force only of design defects of which the Air Force had no knowledge. See Stout, 933 F.2d at 336.
 
 
 30
 The unrebutted deposition testimony of an Air Force engineer involved in the development and implementation of ECP 7054 described how wires were moved from one place in the pylon to another, but that if two wires terminated into the same ground stud that was not changed. This testimony places beyond all the doubt the Air Force's specific knowledge about the design of the electrical circuit. This conclusion about the Air Force's knowledge is sound, even without the benefit of the deposition testimony, because in order for the Air Force to have changed the location of the ground stud in the pylon pursuant to the modification, its responsible officers had to have seen the stud and been aware of its design.
 
 
 31
 The unrebutted affidavits and exhibits describing the development of the C-5A clearly establish that the Air Force approved reasonably precise specifications of the C-5A, the C-5A conformed to those specifications and the Air Force was aware of any safety implications created by the design of the electrical circuit. The plaintiffs did not come forward, as is their burden on summary judgment, with any evidence to create a triable issue of material fact. Therefore, the defendants are entitled to the government contractor immunity defense.
 
 IV. FAILURE TO WARN
 
 32
 A separate failure to warn claim may survive the government contractor immunity defense if the defendant cannot establish "an identifiable federal interest or policy in the existence or methods of warning and a significant conflict between the federal interest or policy and the operation of state law." Garner v. Santoro, 865 F.2d 629, 635-36 (5th Cir.1989). A conflict between federal policy and state law might arise if there is evidence that the Government was involved in the decision to give, or not to give, a warning. Id. But see Stout, 933 F.2d at 336-37 (applying government contractor immunity to a failure to warn claim without reference to a "significant conflict"); Smith, 866 F.2d at 139 (same), Trevino, 865 F.2d at 1487 (same). However, if the failure to warn claim is part of the design defect or unreasonably dangerous product theory of liability, then government contractor immunity applies.[8] Garner, 865 F.2d at 632 n. 8, 635. We will not address whether, under the facts of this case, the failure to warn claim would be defeated by government contractor immunity because the record does not establish whether or not the Air Force and Lockheed or General Electric were involved in discussions about warnings. Without such evidence in the record, it is not possible for this Court to determine whether the Government exercised sufficient discretion with respect to a warning to bring the warning claim within the scope of Boyle. Therefore, we will address the failure to warn claim only on the point whether the manufacturer had a duty, under the relevant state law, to give warnings of facts that were equally within the knowledge of the Air Force.
 
 A. Choice of Law
 
 33
 1. Determining Which Choice of Law Rules to Apply
 
 
 34
 We review a district court's choice of law determination de novo. Allison v. ITE Imperial Corp., 928 F.2d 137, 138 (5th Cir.1991). In a diversity action, a federal court must apply the choice of law rules of the state in which it sits. Klaxon Co. v. Stentor Elec. Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Where a transferee court presides over several diversity actions consolidated under the multidistrict rules, the choice of law rules of each jurisdiction in which the transferred actions were originally filed must be applied. Van Dusen v. Barrack, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); 28 U.S.C. § 1407. Both Texas and Florida have adopted the same choice of law rules: the Most Significant Relationship test set forth in Sections 6 and 145 of the Restatement (Second) of Conflict of Laws (the "Restatement").[9] See Gutierrez v. Collins, 583 S.W.2d 312, 318 (Tex.1979); Bishop v. Florida Specialty Paint Co., 389 So.2d 999 (Fla.1980). Under this doctrine, a court, subject to constitutional constraints, must apply the law of the state with the most significant relationship to the particular substantive issues before the court. Because both parties agree that either Texas or Georgia law applies, this Court's inquiry is limited to the substantive law of those two states. See Mitchell v. Lone Star Ammunition, Inc., 913 F.2d 242, 249 (5th Cir.1990); Crisman v. Cooper Industries, 748 S.W.2d 273, 276 (Tex.App.-Dallas 1988).
 
 
 35
 All of the causes of action in this case rely on the same theory of liability: the defective manufacture and design of the electrical system in the pylon. Therefore, the district court correctly determined that the only substantive issue for the purpose of conflicts analysis was the alleged design defect. See e.g., Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 421 (Tex.1984).
 
 
 36
 2. The Most Significant Relationship Analysis
 
 
 37
 Restatement Section 6 contains the general principles involved in the conflicts analysis whereas Restatement Section 145 lists the factual matters to be considered when applying the Section 6 principles to a given case. See Crisman, 748 S.W.2d at 276. The application of the most significant relationship test turns on the qualitative nature of the contacts rather than the quantity of the contacts outlined in the Restatement. Id. Because the place of injury is fortuitous, correct analysis should give more weight to each state's contacts with the design and manufacture of the electrical system than to the residential choices of the plaintiffs. See Foster v. United States, 768 F.2d 1278, 1282-83 (11th Cir.1985) (fortuitous nature of aircraft accident locale entitled place of injury factor to little weight in conflicts analysis); Restatement § 145, comment e.
 
 
 38
 Virtually all of the relevant conduct complained of took place in Georgia, with some possible activity by General Electric in Ohio. Georgia thus has the strongest interest in applying its law to businesses that design, manufacture and sell products into its stream of commerce. Texas on the other hand, has its only relevant contacts with this case in the fact that many, but not all, of the plaintiffs are domiciled there. Because both the case law and the Restatement instruct us to place more emphasis on the place of the alleged misconduct, than on the residential preferences of scattered plaintiffs, the district court correctly concluded that Georgia law should apply.
 
 B. The Defendants Had No Duty to Warn
 
 39
 In order to defeat the summary judgment, the plaintiffs must offer evidence tending to prove that the defendants knew about a danger created by the design of the wiring and that the failure to warn of that danger was the proximate cause of the injuries alleged. See Talley v. City Tank Corp., 158 Ga.App. 130, 279 S.E.2d 264 (1981). However, there is no duty to warn a purchaser of a physical fact that is open and obvious, or of any potential risk which is equally known and appreciated by both the manufacturer and the purchaser. Herschel McDaniel Funeral Home, Inc. v. Hines, 124 Ga.App. 47, 183 S.E.2d 7, 9 (1971); YMCA v. Bailey, 112 Ga.App. 684, 146 S.E.2d 324 (1965); Gibson v. Consolidated Credit Corp., 110 Ga.App. 170, 138 S.E.2d 77 (1964). The duty to warn extends to the ultimate user of a product. See, e.g., White v. W.G.M. Safety Cap., 707 F.Supp. 544, 547 (S.D.Ga.1988), aff'd 891 F.2d 906 (11th Cir.1989).
 
 
 40
 We need not determine whether, under Georgia law, the Air Force or the pilots are the ultimate users of the C-5A. As discussed, with respect to the government contractor immunity defense, the Air Force was so involved in the C-5A project it knew about the danger--if any--inherent in the circuit design. Therefore, the defendants did not have a duty to warn the Air Force. In addition, the defendants did not have a duty to give a warning to the pilots because the Air Force was a learned intermediary. See, e.g., Stuckey v. Northern Propane Gas Co., 874 F.2d 1563, 1568-69 (11th Cir.1989) (manufacturer's duty to warn ultimate consumer is discharged where an intermediary party has knowledge of the danger). We affirm the summary judgment against the plaintiffs on this claim.
 
 V. LIMITATIONS ON DISCOVERY
 A. Standard of Review
 
 41
 We review decisions regarding discovery for abuse of discretion. Duke v. University of Texas, 729 F.2d 994, 997 (5th Cir.), cert. denied, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 320 (1984).
 
 
 42
 B. Number of Witnesses Permitted for Depositions
 
 
 43
 The plaintiffs argue that this Court should reverse because the district court abused its discretion by limiting the number of witnesses they could depose on the liability issue to 16 for each side. The plaintiffs also want the opportunity to depose more witnesses on issues related to the claims that were not based on the original design of the C-5A. Limiting the number of deposition witnesses to sixteen for each side is not an abuse of discretion in this case. The plaintiffs actually deposed only 15 of their allotted 16 witnesses. Furthermore, we find nothing in the record to suggest that plaintiffs made a timely request to go back and look into issues that were unexamined in earlier discovery, or that plaintiffs were prejudiced by the limitation. The decision to limit deposition testimony to 16 witnesses for each side does not require reversal of this summary judgment.
 
 VI. CONCLUSION
 
 44
 In sum, the defendants have come forward with sufficient evidence to support the assertion of the government contractor immunity defense, and the plaintiffs have failed to raise any genuine issue of material fact regarding that defense. In addition, the defendants did not have the duty to warn the Air Force of the danger--if any--created by the design of the electrical circuit because the Air Force knew as much as the defendants knew about the design of the circuit. Finally, the district court did not abuse its discretion by limiting each side to 16 depositions. The summary judgment for the defendants Lockheed and General Electric is affirmed.
 
 
 45
 AFFIRMED.
 
 
 
 [1]
 Circuit Judge of the Ninth Circuit, sitting by designation
 
 
 [2]
 Lockheed is a Delaware corporation and maintains its principal place of business in Georgia
 
 
 [3]
 General Electric is incorporated and maintains its principal place of business in New York
 
 
 [4]
 Most of the plaintiffs are citizens of Texas, although others are citizens of Florida, Kansas, Missouri and North Dakota
 
 
 [5]
 Ga.Code Ann. § 51-1-11 (Michie 1993). The Georgia statute of repose extinguishes certain products liability claims if they are not brought within 10 years of the first sale of the allegedly defective product. Modifications that change the original design can restart the tolling of the statute of repose, but the modifications in this case did not change the original design of the circuit and therefore the statute of repose did not restart. See Butchkosky v. Enstrom Helicopter Corp., 855 F.Supp. 1251, 1257 (S.D.Fla.1993) (modification must change original design of critical component that is alleged to have caused the injury)
 
 
 [6]
 The district court misinterpreted Georgia law on failure to warn claims. See Chrysler Corp. v. Batten, 264 Ga. 723, 450 S.E.2d 208, 211-13 (1994) ("the legislature carefully excluded failure to warn causes of action from the statute of repose" where the manufacturer has actual or constructive knowledge of a danger) (emphasis added). That error does not affect the outcome of this case
 
 
 [7]
 Section 2680(a) creates an exception to the consent to suit otherwise established by the Federal Tort Claims Act, 28 U.S.C. § 1346(b)
 
 
 [8]
 It is interesting to note that plaintiffs, in their summary judgment reply brief, argued that their failure to warn claim is "nothing more nor less than a type of a design defect." (Record at 1803). If the trial court accepted this argument, then the plaintiffs' failure to warn claim would also have failed because of government contractor immunity. On appeal, however, plaintiffs have asserted that a failure to warn claim is distinct from a design defect claim, and is not preempted by government contractor immunity
 
 
 [9]
 Restatement Section 6 states:
 (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
 (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:
 (a) the needs of the interstate and international systems,
 (b) the relevant policies of the forum,
 (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
 (d) the protection of justified expectations,
 (e) the basic policies underlying the particular field of law,
 (f) certainty, predictability and uniformity of result, and
 (g) ease in the determination and application of the law to be applied.
 Restatement Section 145 states:
 (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
 (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
 (a) the place where the injury occurred,
 (b) the place where the conduct causing the injury occurred,
 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
 (d) the place where the relationship, if any, between the parties is centered.
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.