Joseph D. JORDEN, Appellant,

v.

The ENSIGN–BICKFORD COMPANY, Appellee.

No. 05–97–00928–CV.

Court of Appeals of Texas, Dallas.

June 12, 2000.

Rehearing Overruled July 21, 2000.

---

David R. Weiner, Dallas, Patrick C. Patterson, Law Office of Windle Turley, PC, Dallas, for appellant.

Thomas E. Kurth, W. Alan Wright, Haynes & Boone, L.L.P., Dallas, for appellee.

Before Justices MORRIS, WRIGHT, and MOSELEY.

## OPINION

Opinion by Justice MOSELEY.

United States Army Sergeant first class Joseph D. Jorden ("Jorden") sued a government contractor, the Ensign–Bickford Company ("Ensign–Bickford"), for personal injuries sustained when diversionary hand grenades manufactured by Ensign–Bickford detonated. Ensign–Bickford moved for summary judgment based on the government contractor defense and the absence of causation-in-fact. The trial court granted Ensign–Bickford's motion, and Jorden appeals. For the reasons set forth below, we affirm in part and reverse and remand in part.

### Standard of Review

Ensign–Bickford moved for summary judgment under Tex.R. Civ. P. 166a(c). The standard of review for summary judgments granted pursuant to this subsection is well known. Summary judgment for a defendant is proper when the summary judgment evidence negates an essential element of the plaintiff's cause of action as a matter of law or conclusively establishes all elements of an affirmative defense. *See Black v. Victoria Lloyds Ins. Co.,* 797 S.W.2d 20, 27 (Tex.1990). Only after the defendant produces sufficient evidence to establish the right to summary judgment does the burden shift to the non-movant to produce controverting evidence raising a fact issue as to the elements negated. *See Torres v. Western Cas. & Sur. Co.,* 457 S.W.2d 50, 52 (Tex.1970); *Owen Elec. Sup-*

*ply, Inc. v. Brite Day Constr., Inc.,* 821 S.W.2d 283, 286 (Tex.App.-Houston [1st Dist.] 1991, writ denied).

In deciding whether there is a disputed material fact issue precluding summary judgment, we take evidence favorable to the non-movant as true. *See Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). We indulge every reasonable inference in favor of the non-movant and resolve any doubt in its favor. *See id.* In addition, we accept as true evidence in support of the motion if not controverted. *See Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). From this perspective, we review the summary judgment evidence before the trial court.

### Background

In 1986, the Sandia National Laboratory ("Sandia") entered into an agreement with a "United States Governmental Joint Task Force" to determine the feasibility of an improved diversionary, or "stun," grenade for use by U.S. military forces. Unlike a traditional grenade, the purpose of which is to wound or kill, a stun grenade is designed to distract by producing a temporarily blinding light accompanied by a temporarily deafening concussion, but without the propulsion or dispersion of shrapnel. The then-existing stun grenade, referred to as the M116A1, sometimes resulted in fatalities because the grenade's detonation propelled its metallic head assembly as shrapnel. Additionally, the M116A1 housing could catch fire after detonation, potentially creating a secondary fire hazard. After establishing the feasibility of an improved stun grenade, the Task Force assigned Sandia the task of overseeing completion of its design.

After soliciting bids, Sandia contracted with Ensign–Bickford for the development and fabrication of the new stun grenade, which became known as the MK 141. The MK 141 design incorporated a two-step detonation process; an initial, small detonation disengaged the metal head from the

body of the grenade, and was followed by a much larger, secondary detonation that produced the diversionary "flash bang." The record is replete with evidence concerning the development of the "Sandia specifications" for the MK 141, including Ensign–Bickford's involvement in collaboration with Sandia and with representatives of the Joint Task Force. However, no party points the Court to documents in the record that constitute a final, government-approved set of specifications for the MK 141 resulting from the Sandia project.

In 1991, Ensign–Bickford entered into a contract to manufacture and sell approximately 53,000 MK 141s to the Federal Bureau of Investigation ("FBI"). In May 1992, lot number two of the MK 141s manufactured pursuant to the FBI contract was shipped to the Army at Fort Davis in Panama, where Jorden was stationed. Jorden inspected at least four of the MK 141s and placed them in his assault vest in preparation for their future use. At that time, the MK 141s were intact with the pull rings and pins in place and red plastic caps on the side of each grenade head. Several days later, while preparing for a mission, Jorden went to his unit's "ready/launch" tent, which housed all of the unit's ammunition, gas, explosives, weapons, and loaded assault gear. Jorden removed three MK 141s from his assault vest and held them in his left hand. As he removed a fourth MK 141 from his vest, he heard the fuse ignite. Jorden dropped the fourth MK 141, but it discharged three or four inches away from his right hand. The blast also caused the three MK 141s in Jorden's left hand to explode. These detonations resulted in significant injuries to Jorden's left hand and abdomen.

Jorden sued Ensign–Bickford alleging design and manufacturing defects, failure to warn, negligence, and misrepresentation under section 402B of the Restatement (Second) of Torts. Ensign–Bickford moved for summary judgment on Jorden's claims on two grounds: the government

contractor defense and the absence of causation-in-fact as a matter of law. The trial court granted Ensign–Bickford's motion without specifying the grounds on which the summary judgment was based and entered a judgment against Jorden on all claims. Jorden appealed, asserting the trial court erred in granting Ensign–Bickford's motion for summary judgment as to his claims involving design defect, failure to warn, and misrepresentation.

### NEGLIGENCE AND MANUFACTURING DEFECT

Jorden does not assert or argue that the trial court erred in granting summary judgment disposing of his negligence and manufacturing defect causes of action. Thus, we affirm that part of the trial court's judgment. *See Pat Baker Co. v. Wilson*, 971 S.W.2d 447, 450 (Tex.1998).

### GOVERNMENT CONTRACTOR DEFENSE

#### A.  Design Defect Claim

■■■ In points of error one and two, Jorden asserts the trial court erred in granting Ensign–Bickford's motion for summary judgment as to his design defect claim because Ensign–Bickford failed to conclusively establish all the elements of the government contractor defense. This defense immunizes government contractors from civil liability arising out of the performance of federal procurement contracts. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504–06, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The elements of the government contractor defense are: (1) the United States approved reasonably precise specifications for the equipment at issue; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about any dangers in the use of the equipment that were known to the supplier but not to the United States. *See Boyle*, 487 U.S. at 512, 108 S.Ct. 2510; *Feldman v. Kohler Co.*, 918 S.W.2d 615, 627 (Tex.App.-El Paso 1996, writ denied). The first element of the government contractor defense may also be satisfied by proof that the government

accepted and used the product in question in such a manner that its approval of the design can be presumed. *See Perez v. Lockheed Corp.*, 81 F.3d 570, 575 (5th Cir. 1996); *Haltiwanger v. Unisys Corp.*, 949 F.Supp. 898, 904 (D.D.C.1996). If the government contractor does not prove the first element of the defense (actual or presumed approval of reasonably precise specifications), then, as a matter of law, it has not proved the second element of the defense (conformity with such specifications). *See Feldman*, 918 S.W.2d at 627.

1. Approval of Specifications

■ We initially consider whether Ensign–Bickford conclusively established that the government approved reasonably precise specifications for the MK 141s manufactured and sold under the FBI contract. Section C of the FBI contract stated "[a]ll items delivered in performance of this contract shall be manufactured with the most recent Government approved specifications." Ensign–Bickford points to numerous affidavits and documents it filed in support of its motion discussing the Sandia specifications. However, there is no indication in the record that the Sandia specifications are those referred to in the FBI contract.[1] Ensign–Bickford conceded as much in oral argument. In response to a direct question by the Court regarding what summary judgment evidence indicates that the Sandia specifications and the FBI specifications were the same, Ensign–Bickford stated that there is no evidence that specifically states that the specifications referred to in Section C of the FBI contract are the specifications allegedly approved by the government. Absent summary judgment proof that the Sandia specifications were the "most recent Government approved specifications" for the

MK 141s as of the date of the FBI contract, Ensign–Bickford's evidence regarding the Sandia specifications falls short of establishing the first element of the government contractor defense with respect to the MK 141s involved in this case.

In a post-submission letter brief, Ensign–Bickford points to various aspects of the record and argues that the specifications cited thereto are the same specifications referred to in the FBI contract. Ensign–Bickford states that the FBI contract was a mere continuation of the production of the MK 141 Mod O Diversionary Device and that the grenades produced pursuant to the FBI contract were modeled upon the Army's M201A1 grenade. Ensign–Bickford argues that this evidence conclusively establishes that the design specifications contained in the record are the same specifications referred to in the FBI contract. However, from reviewing the record as a whole, we still conclude that the record is inconclusive and instead raises a fact issue as to this point.

Ensign–Bickford also argued there is no summary judgment evidence suggesting that the Sandia specifications *are not* the "most recent government approved specifications," or even suggesting that specifications other than the Sandia specifications exist. This argument is unavailing, as it improperly attempts to shift the burden of summary judgment proof from Ensign–Bickford to Jorden. *See* TEX.R. CIV. P. 166a(c); *Black*, 797 S.W.2d at 27.

■ Ensign–Bickford cites the affidavit of David Hall, a group leader and senior quality engineer at Ensign–Bickford, as evidence that the MK 141s delivered under the FBI contract conformed to whatever specifications were applicable to the FBI

---

1. One example as to the inconclusiveness concerning which specifications were embodied in the FBI contract is an amendment to the FBI contract that states "the production of the MK141 Mod O Diversionary Device shall be manufactured in accordance with the processes, configuration and acceptance criteria set forth in the following documents . . .:

1. EB PN ~~123589~~ *234589*, REV. H
2. EB Specification—PS 207
3. EB QA Plan—QA 1413."

However, Ensign–Bickford does not direct the Court to evidence in the record containing these documents or revealing the contents of such documents.

contract. Hall's affidavit states: "Attached hereto as Exhibit 1 is a true, accurate, and authentic copy of the Certificate of Compliance whereby I, on behalf of [Ensign–Bickford] certified on May 29, 1992 that [the lot of grenades involved in Jorden's injuries] conformed to the specifications then in effect under [the FBI contract]." At oral argument, Ensign–Bickford argued that the language in Hall's affidavit and the attached document, read together, conclusively establishes that the MK 141s conformed to government specifications. We disagree.

Moreover, a review of the Certificate attached to Hall's affidavit, does not support Hall's description of the document. The Certificate, entitled "Quality Control Department Certification of Compliance Analysis," does not state on its face that the MK 141s met government specifications. Instead, the Certificate states only that "Documentary evidence in the form of physical and/or chemical *test reports* relative to material supplied in accordance with the above purchase order number *are on file and available for review* at the seller's facility." (Emphasis added.) Thus, the Certificate does not purport to verify that the MK 141s complied with the specifications applicable under the FBI contract, or even that the MK 141s passed the tests mentioned in the Certificate.[2] Because the Certificate by its own terms does not verify conformity with any specifications, Hall's conclusory description of the Certificate does not conclusively establish that the MK 141s involved in Jorden's injuries complied with the applicable specifications. *See Hidalgo v. Surety Sav. & Loan Ass'n,* 487 S.W.2d 702, 703 (Tex. 1972); *Classen v. Irving Healthcare Sys.,* 868 S.W.2d 815, 822 (Tex.App.-Dallas 1993), *rev'd on other grounds,* 898 S.W.2d 300 (Tex.1995).

Even if the summary judgment evidence established that Section C of the FBI contract referred to the Sandia specifications, Ensign–Bickford's evidence still falls short in at least two instances. First, an amendment to the FBI contract provided that during the production of the first 25,000 units, Ensign–Bickford would put forth its best efforts to achieve certain performance goals. The amendment further stated:

> That, if *at the conclusion of the production of the first 25,000 units, or six (6) months (whichever occurs later),* the above desired program performance goals are determined by the Government to be unachievable, *then* at the written direction of the Contracting Officer, *Ensign Bickford Aerospace Company shall commence finalizing the Technical Data Package with all mutually agreed upon changes incorporated into it* and deliver it in accordance with the requirements, specifications, standards and documentation set forth in the U.S. Naval Weapons Support Center's document number 8060/951, Ser 50252/U1097, dated 6/22/91, with delivery to take place no later than 4 months following receipt of said written Government direction, at a cost not to exceed $86,824.00.

(Emphasis added.) There is no evidence as to whether a final "Technical Data Package" was ever delivered and approved, or which, if any, "mutually agreed upon changes" were incorporated into it.

Thus, even assuming the Sandia specifications were the "most recent government approved specifications" as of the date of the FBI contract, the above amendment appears to envision and request (or at least allow) additional changes to the specifications called for in Section C, in an attempt to meet the performance goals discussed in the contract amendment. Indulging every reasonable inference in favor of Jorden, this evidence indicates the specifications for grenades sold under the FBI contract were not final, but were in

---

**2.** Hall's affidavit and the attached Certificate also do not identify the Sandia specifications as those called for by the FBI contract.

flux well after Ensign–Bickford began manufacturing.

Even if the summary judgment evidence established that Section C of the FBI contract referred to the Sandia specifications, and that those specifications were not changed pursuant to the amendment to the contract, the summary judgment evidence falls short of establishing the first prong of the government contractor defense for a second reason. Although the Sandia specifications resulted from the collaborative efforts of Sandia, the Joint Task Force, and Ensign–Bickford under the Sandia contract, the record does not contain uncontroverted evidence affirmatively stating that the Sandia specifications ever received final government approval. Ensign–Bickford does not point the Court to any other evidence in the record stating whether the government expressly approved the Sandia specifications, who approved the Sandia specifications, or when they were approved. Additionally, there is some evidence from which the trial court could infer the opposite. For instance, the affidavit of John Clifton, the Navy's representative to the Joint Task Force, discussed the specifications developed under the Sandia contract. He indicated that the Army, Marine, and Navy Special Operations Forces offered competing performance criteria that "resulted in producability [sic] problems and in continued alteration of the design in hopes of improving upon such problems." Clifton did not state that these design alterations ever resulted in a final, government approved set of specifications. Again indulging every reasonable inference in favor of Jorden, as the trial court and this Court are required to do, this evidence indicates that the government did not agree among themselves on what the specifications should be under the Sandia contract.

Thus, the record does not conclusively establish that: (1) the Sandia specifications themselves ever received final government approval; (2) Section C of the FBI contract referred to the Sandia specifications, and thus made them applicable to the grenades that injured Jorden; or (3) the FBI contract, as amended, called for compliance with any previously approved government specifications, at least for the initial 25,000 grenades manufactured under the contract. Absent any one of these facts, we cannot conclude that the record establishes as a matter of law that the government approved reasonably precise specifications for the MK 141s sold under the FBI contract.

2. Presumed Approval Based on Acceptance and Use

■ As noted above, an alternate method of proving the first element of the government contractor defense is to prove the government accepted and used the product in such circumstances that the government's approval of the design can be presumed. Some of the cases reaching this presumption involved the acceptance and use of an equipment design for over twenty years. *See Perez,* 81 F.3d at 575 (C–5A aircraft); *Haltiwanger,* 949 F.Supp. at 904 (multiple position letter sorter machine). In these cases, the courts held that evidence that the equipment had been accepted and widely used for such a lengthy period of time manifests an acceptance of the basic design, which satisfies the first element of *Boyle. See Perez,* 81 F.3d at 575; *Haltiwanger,* 949 F.Supp. at 904.

Michael McChessney, the Assistant Program Manager for Special Operations Forces Ordnance Systems, who coordinated the acquisition of MK 141s, stated by affidavit that, on behalf of the Army, he approved acceptance of lot two of the MK 141s under the FBI contract in September 1992. Jorden was injured by the MK 141s from this lot in December of 1994. It is unclear from the record and the briefs exactly when Ensign–Bickford delivered the first lot of MK 141s under the FBI contract. However, even assuming the longest possible period for their acceptance and use, it does not come close to the extended period recognized by *Perez* and

*Haltiwanger* as creating a presumption that the government approved the specific design of the equipment.

■ Ensign–Bickford argues that the design of the MK 141 *pin assembly* had been used by the government for "some time," evidencing government approval of the grenade's pin design. As evidence supporting this argument, Ensign–Bickford points to Clifton's affidavit who, as project manager of the Special Purchase Munitions Group with the Naval Surface Weapons Center, was the Navy's representative on the Joint Task Force working with Sandia. Clifton stated that "[t]he Joint Task Force also *asked* that the improved device possess *generally* the same fuse initiation system (i.e., safety pin, lever, striker, primer) as the standard military grenades then in use such as the M201A1." (Emphasis added.) Clifton's use of the words "asked" and "generally" undercut the characterization of his affidavit as providing conclusive evidence of prior extensive governmental acceptance and use of the fuse initiation system used in the MK 141s sold under the FBI contract.

Moreover, Clifton's affidavit speaks to the efforts of Sandia, the Joint Task Force, and Ensign–Bickford to develop the Sandia specifications. Again, absent summary judgment proof that the Sandia specifications and the specifications called for by the FBI contract are the same, Clifton's statement does not conclusively relate to the fuse initiation system used in the MK 141s at issue here, such as to permit the trial court to presume that the government approved its design. And again, even if Section C of the FBI contract referred to the Sandia specifications, Clifton's affidavit does not negate whether the fuse initiation system he references was revised pursuant to the FBI contract amendment, which appears to call for or allow additional revisions to the "Technical Data Package," incorporating additional "mutually agreed upon changes." Under these facts, we cannot conclude that the evidence regarding the acceptance and use of the MK 141s or of their fuse initiation system was sufficient to manifest governmental approval of the MK 141 design as a matter of law.

### 3. Conformity with Specifications

Because we conclude the first element of the government contractor defense has not been conclusively established, we also conclude Ensign–Bickford did not conclusively prove the second element of the government contractor defense-that the MK 141s conformed to approved government specifications. Absent proof of the approved specifications, it is not possible to conclude as a matter of law that the MK 141s at issue met those specifications. *See Feldman,* 918 S.W.2d at 627.

### 4. Conclusion

We conclude Ensign–Bickford did not conclusively establish either the first or second elements of the government contractor defense. We sustain Jorden's points of error one and two.

### B. Failure to Warn

In his fourth point of error, Jorden asserts the trial court erred in granting Ensign–Bickford's motion for summary judgment as to Jorden's failure to warn claim because: (1) Ensign–Bickford did not address Jorden's failure to warn claim in its motion for summary judgment; and (2) Ensign–Bickford did not meet its burden of proof as to the government contractor defense.

■ A review of Ensign–Bickford's motion for summary judgment reveals that the motion requested and argued for summary judgment on all of Jorden's causes of action based on two defenses: government contractor defense and no cause-in-fact. Thus, we conclude the motion was sufficiently broad to address Jorden's cause of action for failure to warn.

■ From reviewing the record, we find two general comments concerning the warning labels. In his affidavit, Mr. Clifton stated that, "[i]n addition to many others, one specific item on which I was

asked to comment and advise was the wording of the warning label applied to the MK 141." Mr. Puls, Ensign–Bickford's engineer chiefly responsible for management and oversight of the MK 141 program during the design development phase, stated in his affidavit that "[t]hese drawings were modeled upon like drawings from the Army's M201A1 grenade. The drawings pursuant to which Lot 2 was built likewise specified the physical dimensions and characteristics of the warning label placed on the device as well as the specific wording contained thereon."

In light of these statements and the evidence discussed above, Ensign–Bickford has not pointed us to any summary judgment evidence indicating that the United States approved reasonably specific standards for the warning label or labels, what those standards were, or even what the labels said. Therefore, we conclude that Ensign–Bickford's summary judgment evidence does not conclusively establish either the first or second elements of the government contractor defense as to Jorden's failure to warn claim. *See Feldman*, 918 S.W.2d at 627.

## Cause-In-Fact

We next consider whether Ensign–Bickford established, as a matter of law, the absence of cause-in-fact as to Jorden's causes of action. In its motion for summary judgment, Ensign–Bickford argued that the summary judgment evidence conclusively established that: (1) the MK 141s which exploded were not defective when they left the manufacturer; and (2) the MK 141s were altered after having been received by Jorden. Ensign–Bickford further argued that because the evidence conclusively established that there was no defect and that the MK 141s were altered, the summary judgment evidence conclusively negated the essential element of cause-in-fact as to Jorden's causes of action.

In its motion for summary judgment, Ensign–Bickford stated that "Jorden un-equivocally stated in his deposition that the MK 141s that are the subject of the lawsuit were free of defects and 'in proper operating condition' when he received them seven to ten days before the accident." Ensign–Bickford went on to summarize Jorden's sworn testimony as stating that the MK 141s were "free from defects when he received them." However, a review of Jorden's deposition testimony reveals that Jorden only commented that when he received the grenades he thoroughly inspected them, the pull pins were in, the protective caps were on, and they *appeared* to be in proper operating condition. This testimony does not conclusively negate any design defects in the grenades; Jorden's testimony only establishes that, to him, they *appeared* to be in a proper condition.

In its motion for summary judgment, Ensign–Bickford argues that the testimony conclusively proves that the grenades were altered (by removal of the pull pin) after Jorden received them. The premise upon which Ensign–Bickford bases its argument is that "the grenade simply would not have blown up if the pin had not been removed." Building on this premise, Ensign–Bickford cites Jorden's deposition testimony that it was his "understanding" that it takes ten to thirty pounds of pressure to remove a pull pin. Jorden further testified that the ready tent where the grenades were housed was left unguarded for approximately fifteen hours a day. Also, as noted above, Jorden testified that when he unpackaged and inspected the MK 141s and put them into his vest, the pull pins were still in place and the grenades were topped with a plastic cap. Ensign–Bickford points to deposition testimony of third parties to the effect that, immediately after the explosion, Jorden stated the pull pin was missing on the MK 141 that initially detonated.

In his subsequent deposition, however, Jorden testified that "I have no reason to believe that the pin was or was not there. So—I have no reason to believe that the

pin was not there." For summary judgment purposes, we take evidence favorable to Jorden as true and we do not consider evidence which favors Ensign–Bickford's position unless it is uncontroverted. *See Sullivan v. Bickel & Brewer,* 943 S.W.2d 477, 480 (Tex.App.-Dallas 1995, writ denied). Applying this standard, the summary judgment evidence does not conclusively prove that the grenade was altered by removal of the pin.

### A. Design Defect

In his third point of error, Jorden asserts the trial court erred in granting Ensign–Bickford's motion for summary judgment because Ensign–Bickford failed to conclusively negate the essential element of cause-in-fact as to his design defect claim. *See Union Pump Co. v. Allbritton,* 898 S.W.2d 773, 774–75 (Tex.1995). In light of our discussion above, we agree and sustain Jorden's third point of error.

### B. Failure to Warn

In his fourth point of error, Jorden challenges the trial court's granting of summary judgment as to his failure to warn claim. Our conclusion regarding Ensign–Bickford's failure to conclusively negate the essential element of cause-in-fact as to Jorden's design defect claim is likewise applicable to Jorden's failure to warn claim. Because we have previously concluded that Ensign–Bickford failed to establish its government contractor defense as to Jorden's failure to warn claim, and because we have concluded that Ensign–Bickford failed to negate the element of cause-in-fact, Ensign–Bickford has failed to establish as a matter of law both of its grounds for summary judgment as to Jorden's failure to warn claim. We, therefore, sustain Jorden's fourth point of error.

### MISREPRESENTATION

In his fifth point of error, Jorden asserts the trial court erred in granting summary judgment as to his claim for misrepresentation under section 402B of the Restatement (Second) of Torts. *See Crocker v. Winthrop Labs.,* 514 S.W.2d 429, 431 (Tex. 1974) (adopting section 402B of the RESTATEMENT (SECOND) OF TORTS). Jorden argues that Ensign–Bickford's motion for summary judgment did not address this cause of action. We have already concluded Ensign–Bickford's motion addressed all of Jorden's claims. Thus, the motion was sufficiently broad to address Jorden's cause of action for misrepresentation. However, we have previously concluded that Ensign–Bickford did not sustain its summary judgment burden on either of the grounds for summary judgment asserted in its motion. Thus, the trial court erred in granting summary judgment on Jorden's misrepresentation claim. We sustain Jorden's fifth point of error.

### CONCLUSION

We have spent extensive time reviewing the briefs and the record before us. Although the record is replete with summary judgment evidence about the Sandia specifications and the process by which they were developed, Ensign–Bickford has not pointed us to summary judgment evidence that clearly and unequivocally states that the Sandia specifications were approved on behalf of the government on a certain date or by a certain person, or that the FBI contract, as signed or amended, called for the Sandia specifications. Our own search of the record also failed to reveal this evidence. Applying the correct standard of review and reviewing the record as a whole, we conclude the summary judgment evidence does not conclusively establish all of the elements of the government contractor defense. Nor does the summary judgment evidence conclusively negate the element of cause-in-fact. Therefore, the trial court erred in granting summary judgment as to Jorden's claims regarding defective design, failure to warn, and misrepresentation. We reverse the trial court's summary judgment as to these claims, affirm the remainder of the judgment, and

remand this cause to the trial court for further proceedings.