**Michelle J. FELDMAN, Appellant,**

v.

**The KOHLER CO., Stant, Inc., and Electronic Warfare Associates, Appellees.**

**Michelle FELDMAN, Appellant,**

v.

**L & M RADIATOR, INC., Appellee.**

**Nos. 08–94–00094–CV, 08–94–00333–CV.**

Court of Appeals of Texas,
El Paso.

March 7, 1996.

Rehearing Overruled April 3, 1996.

Michael Y. Saunders, Helm, Plethcer, Bowen & Saunders, Houston, John W. Tavormina, Helm, Pletcher, Bowen & Saunders, L.L.P., Houston, Carl D., Jr. Kulhanek, Houston, for Appellant.

R. Wayne Pritchard, Brandys Carson & Pritchard, P.C., El Paso, Sharis L. Hauder, Fanning, Harper & Martinson, Dallas, Benjamin A. Escobar, Scott, Hulse, Marshall, Feuille, Finger & Thurmond, P.C., El Paso, for Appellees in No. 08–94–00094–CV.

Paul Bracken, Robles Bracken Coffman & Hughes, El Paso, John A. Kazen, Kemp, Smith, Duncan & Hammond, P.C., El Paso, for Appellee in No. 08–94–00333–CV.

Before LARSEN, McCLURE and CHEW, JJ.

## OPINION

McCLURE, Justice.

Our opinion of September 14, 1995 in case number 08–94–00333–CV is withdrawn and the following substituted in its stead.

We are presented with two appeals arising out of the same incident. Originally, Appellant, Michelle J. Feldman ("Feldman"), sued Appellees, Electronic Warfare Associates ("EWA"), The Kohler Company ("Kohler"), Stant, Inc. ("Stant"), and L & M Radiator, Inc. ("L & M"), on various product liability theories, including strict liability, negligence, and breach of warranty. The district court granted summary judgment in favor of L & M on the affirmative defense of government contractor immunity under federal law. Feldman's claims against L & M were severed and Feldman appealed by three points of error attacking the summary judgment on legal and factual grounds. Subsequently, the trial court granted summary judgment in favor of EWA, Stant, and Kohler. Feldman also appealed these judgments, challenging the application of the government contractor defense to Feldman's defective design and failure to warn claims against EWA; and challenging the district court's decision that Feldman presented no factual issue as to her claims against Stant and Kohler, respectively. We join these cases for purposes of our opinion to facilitate the factual summary and the legal analysis. We affirm in part and reverse and remand in part.

## SUMMARY OF THE EVIDENCE

Feldman worked as a mechanic for General Electric in El Paso, Texas. She was burned while working on an XM09S vehicle used for training United States Armed Forces and operated by General Electric. The XM09S simulates a Soviet anti-aircraft missile launcher and is utilized in "war games."[1] Feldman's injuries occurred when the radiator cap blew off a supplemental radiator on an XM09S she was servicing. This radiator cap was never recovered. Presumably, the explosion was caused when pressure built up in the cooling system as a result of air locks that occasionally formed in the radiator hoses. Subsequent to this accident, release valves were installed on the cooling system to prevent this type of accident from recurring. Alleging products liability and negligence claims, Feldman sued Kohler, manufacturer of the XM09S's generator engine, EWA, who redesigned the cooling system for the vehicle under government contract, L & M, who designed and built the supplemental radiator, and Stant, manufacturer of the radiator cap.

The XM09S vehicle contained two engines; a Chrysler V–8 propelled the vehicle itself, while a Kohler four-cylinder engine powered the vehicle's weapons systems. Both engines were originally connected to one radiator for cooling. The original engine cooling configuration led to problems with overheating and

---

1. During these "war games," military personnel are taught to recognize, track and spot, both visually and with equipment, the simulated Soviet missile launcher and to respond to its maneuvers.

EWA was retained to solve the overheating problem.

The record includes the deposition testimony of Feldman; Lawrence Davis, the EWA engineer tasked with solving the overheating problem; and Toby Brooks, a mechanical engineer with General Electric. We also have before us the affidavits of Richard Braun, executive vice-president of L & M; Alan J. Wilson, manager of sales administration for Kohler; John Blommel, director of marketing services for Stant; and Gary Smith, a professional engineer and expert witness for Feldman. The record reflects that Davis first recommended that the panels channeling airflow to the radiators be replaced, as they had apparently been removed by the operators. This proposal was rejected. Next, Davis proposed that an additional cooling fan and radiator be added in front of the Kohler engine, together with extra venting. This proposal was rejected because it changed the profile of the vehicle some one and one-half to two feet. His next proposal was that an air-cooled engine be installed in place of the existing Kohler engine, with additional venting and a blower added. This proposal was rejected because of cost and because it would create a profile change. Davis' final proposal was that a supplemental radiator be added for the Kohler engine, and that the venting be changed; this modification was accepted. Davis approached L & M with design criteria for a radiator, which L & M designed and constructed. The modified system continued to suffer overheating problems due to air locks forming in the long radiator hoses required by the modification.[2] When the air locks were absent, the cooling system worked correctly.

Davis did not work in a vacuum. The various proposals were discussed and acted upon by a group including civilian engineers and military personnel. This group made the final decision as to what modifications would be made and no modifications could be made without approval of the government.

A government team known as ADATS[3] participated in the group meetings and was responsible for the approval of all modifications. ADATS decided whether proposed changes met with the other design criteria of the vehicle, and supplied ideas as to what should or should not be done.

The design criteria required by ADATS are critical to our inquiry. First, Davis had to work with the existing vehicle. Second, the modifications could not affect the profile of the vehicle even slightly. Apparently, these requirements were meant to preserve the usefulness of the vehicle as a simulator; if it did not look like a Soviet anti-aircraft missile vehicle, it could not simulate one. Third, Davis was required to retain the existing Kohler engine, as buying new engines was too costly. Finally, the Kohler engine had to be mounted on rails for easy maintenance access. This requirement necessitated extra-long radiator hoses so that the Kohler engine could slide out of the vehicle for maintenance.[4] Davis' suggestion that access panels be installed for engine maintenance, rather than rails, was rejected. The group's decision to go with the supplemental radiator led to derivative criteria for the supplemental radiator. The radiator could only be placed in one position in the vehicle, mounted above the Chrysler V–8 engine and the existing radiator. This in turn led to restrictions on the possible dimensions of the supplemental radiator. Furthermore, the supplemental radiator could only be mounted in a horizontal position. Davis showed L & M the engine, the engine data, and the space in which the radiator would be mounted. Richard Braun's affidavit stated that all relevant design criteria for the radiator were dictated by the pre-existing features of the vehicle, including the size of the engine, the existence or lack of a cooling fan, the configuration of the engine compartment, and the physical dimensions allowed for the radiator. Braun further stated that L & M had no discretion

2. L & M did not provide or manufacture the hoses, nor did it participate in any decisions concerning the hoses.

3. The only reference in the record explaining this acronym is "Air Defense something or another."

4. Feldman testified that the hoses were ten feet long.

to alter any of the specifications, which he described as "very precise."

## STANDARD OF REVIEW

The standard of review on appeal of a summary judgment is whether the successful movant at the trial level carried its burden of showing that there is no genuine issue of material fact and that judgment should be granted as a matter of law. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991); *Nixon v. Mr. Property Management Co., Inc.* 690 S.W.2d 546, 548 (Tex.1985); *Hernandez v. Kasco Ventures, Inc.,* 832 S.W.2d 629, 631 (Tex.App.—El Paso 1992, no writ). Thus, the question on appeal is not whether the summary judgment proof raises fact issues as to required elements of the movant's cause or claim, but whether the summary judgment proof establishes, as a matter of law, that there is no genuine issue of material fact as to one or more elements of the movant's cause or claim. *Gibbs v. General Motors Corp.,* 450 S.W.2d 827, 828 (Tex.1970).

In resolving the issue of whether the movant has carried this burden, all evidence favorable to the non-movant must be taken as true and all reasonable inferences, including any doubts, must be resolved in the nonmovant's favor. *Nixon,* 690 S.W.2d at 548–49; *Stoker v. Furr's, Inc.,* 813 S.W.2d 719, 721 (Tex.App.—El Paso 1991, writ denied). Where the defendants are the movants and they submit summary judgment evidence disproving at least one essential element of each of plaintiff's causes of action, then summary judgment should be granted. *Perez,* 819 S.W.2d at 471; *Bradley v. Quality Service Tank Lines,* 659 S.W.2d 33, 34 (Tex.1983); *Hernandez,* 832 S.W.2d at 633. Alternatively, the defendant-movant must conclusively establish each essential element of an affirmative defense. *Zep Mfg. Co. v. Harthcock,* 824 S.W.2d 654, 657 (Tex.App.—Dallas 1992, no writ); *Traylor v. Unitedbank Orange,* 675 S.W.2d 802, 804 (Tex.App.—Beaumont 1984, writ ref'd n.r.e.).

## THE GOVERNMENT CONTRACTOR DEFENSE

L & M and EWA were granted summary judgment as to all of Feldman's claims based on the government contractor defense, which is predicated upon the notion that state law tort actions can significantly conflict with the federal government's unique role as the procurer of weapons systems. Essentially, when certain conditions are met, this defense allows a government contractor to enjoy the immunity from suit that the United States enjoys.[5] This case presents the first thorough application of this defense on the merits in a Texas Court of Appeals.[6]

Though various federal circuit courts had fleshed out the germinal conditions for the application of this common law defense, *see e.g., Tozer v. LTV Corp.,* 792 F.2d 403 (4th Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988); *Dowd v. Textron, Inc.,* 792 F.2d 409 (4th Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 930 (1988); *Bynum v. FMC Corp.,* 770 F.2d 556 (5th Cir.1985); *McKay v. Rockwell Int'l Corp.,* 704 F.2d 444 (9th Cir. 1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984), the United States Supreme Court clarified it in *Boyle v. United Technologies Corp.,* 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). Boyle, a United States Marine helicopter copilot, drowned when his helicopter crashed off the coast of Virginia and was submerged. *Id.* at 502, 108 S.Ct. at 2513. Though he survived the initial crash, he could not escape the sinking craft because water pressure prevented him from opening the escape hatch. *Boyle,* 487 U.S. at 502–03, 108 S.Ct. at 2513–14. His survivors sued the helicopter's manufacturer for defectively designing the escape hatch to open outward rather than inward. *Id.* Presum-

---

**5.** *See* Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a) (1988) (providing an island of immunity for discretionary governmental decisions).

**6.** The defense was addressed in *Trapnell v. Sysco Food Services, Inc.,* 850 S.W.2d 529, 550 (Tex. App.—Corpus Christi 1992), *aff'd,* 890 S.W.2d 796 (Tex.1994), but that Court found a total

absence of proof as to the defense. *See also Arceneaux v. Lykes Bros. Steamship Co., Inc.,* 890 S.W.2d 191 (Tex.App.—Beaumont 1994, writ pending), in which the Court affirmed the granting of summary judgment on alternative grounds, obviating the necessity for a discussion of the defense.

ably, the government contract required the manufacturer to "manufacture and deliver" helicopters with this feature. *Id.* at 509, 108 S.Ct. at 2517.

The Court began its analysis by finding that the procurement of military equipment was a "uniquely federal interest." *Id.* at 504–07, 108 S.Ct. at 2514–16. Having determined this first step in finding preemption of state tort law, it analyzed the degree of conflict between that state law and federal law or policy necessary to extend the government's immunity to non-government actors. *Id.* at 507–13, 108 S.Ct. at 2516–19. Although a "significant conflict" must exist, the requisite degree of conflict is less than in those instances in which Congress attempts to legislate in areas of traditional state prerogative. *Id.* at 507–08, 108 S.Ct. at 2516. In attempting to strike a balance in this conflict dilemma, the Court rejected the previous basis of the defense centered in the *Feres–Stencel* doctrine,[7] a limitation that allowed application of the defense only to military personnel. *Boyle,* 487 U.S. at 509–11, 108 S.Ct. at 2517–18; *see also Trevino v. General Dynamics Corp.,* 865 F.2d 1474, 1478 (5th Cir.1989), *cert denied,* 493 U.S. 935, 110 S.Ct. 327, 107 L.Ed.2d 317 (1989) (discussing the *Feres–Stencel* doctrine). It instead grounded the defense in the FTCA's exception for discretionary government actions. *Boyle,* 487 U.S. at 511–12, 108 S.Ct. at 2518–19. Predicating the basis for the government contractor defense on the discretionary function exception fundamentally affected the analysis used to apply the defense. *See Trevino,* 865 F.2d at 1479.

■ Having concluded that in some circumstances, state laws which hold government contractors liable for design defects in military equipment present a significant conflict and must be displaced, the Court proceeded to address the scope of displacement. Adopting a three-prong test designed to locate the ultimate decision-maker, the Court found that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518. The apparent goal of this test is to assure that the government has made an informed choice about the design of its equipment. If the government exercised discretion with respect to the design feature in question, a conflict necessarily arises in applying state-imposed duties to the government's contractor. *See Lewis v. Babcock Indus., Inc.,* 985 F.2d 83, 86–87 (2d Cir.1993) (stating that "if the Government did approve [reasonably precise] specifications, conflicting state tort law is preempted").

*Boyle* identified three possible situations in which the operating circumferences of federal law and state law may interact: (1) federal law and state law impose coterminous duties; (2) federal law and state law impose different, but non-mutually exclusive, duties; and (3) federal law and state law impose different, mutually exclusive duties. *Boyle,* 487 U.S. at 508–09, 108 S.Ct. at 2516–17. However, differentiating between the second and third situations has proved difficult at best,[8]

7. *See Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Stencel Aero Eng'g Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977).

8. To illustrate the second situation, the Court used an example of government procurement of an air conditioning unit. *Id.* at 509, 108 S.Ct. at 2517. In this example, the government specified only the cooling capacity of the air conditioner, leaving the precise method of construction to the contractor. *Id.* The Court stated that "a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised to the Government, but neither would

it be contrary." *Id.* However simple this example may sound on the surface, it does not address two fundamental and interrelated questions. First, it does not address the conceivable situation, arguably the situation involved in this case, in which the government specifications, though not explicitly prohibiting the application of state law, so constrict the universe of design choices available to the contractor that little discretion is left to it. Second, it does not address the ability of the government to approve a design conforming to those specifications notwithstanding its possible violation of state law.

*Boyle* provides an example of the third situation, although the entity that initially developed

and the three-prong test provides little guidance where both the government and the contractor participate in the design phase of the procurement process.[9] Essentially, the question reduces to a determination of how much government involvement during the design phase is necessary to trigger application of the government contractor defense. Some courts tend to view the procurement process as a whole in making their determinations, *see e.g., Stout v. Borg–Warner Corp.*, 933 F.2d 331 (5th Cir.1991) (holding that the Army approved reasonably precise specifications for the design of an air conditioner though the original specifications did not provide for nor prohibit the safety device at issue); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67 (3d Cir.1990) (looking for an actual policy judgment behind the government approval rather than an explicit bar to the operation of state law); *Kleemann v. McDonnell Douglas Corp.*, 890 F.2d 698 (4th Cir.1989), *cert. denied*, 495 U.S. 953, 110 S.Ct. 2219, 109 L.Ed.2d 545 (1990) (holding that the government did not relinquish discretion when it significantly participated in a back and forth design process); *Smith v. Xerox Corp.*, 866 F.2d 135 (5th Cir.1989) (upholding the government contractor defense though the original specifications only set out minimal conditions not preclusive of state law), whereas other courts tend to fracture the process in an attempt to find enclaves of contractor discretion in which state law may survive. *See e.g., Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794 (5th Cir.

1993) (holding that silence in the government's specifications regarding a particular *product feature* precludes application of the government contractor defense).

An essential element in the application of the *Boyle* test is whether the government has given meaningful approval to the design in question. Prior to *Boyle*, a central axiom in applying the defense was that the government could not approve a proposed design with a mere "rubber stamp." *See Tozer*, 792 F.2d at 407–08 (stating that "genuine governmental participation in the design" must exist). In *Trevino v. General Dynamics Corp.*, 865 F.2d at 1474, the Fifth Circuit continued this tradition and extensively analyzed the requisite approval needed to trigger application of the defense. *Trevino*, 865 F.2d at 1479–86. There, the survivors of several navy divers brought a product liability action against the manufacturer of a diving hanger used to dispatch divers from a submarine. *Id.* at 1476. The divers were killed when a vacuum was created as water drained from the hanger. *Id.* General Dynamics Corporation Electric Boat Division ("General Dynamics") was employed by the Navy to design the diving hanger in question. *Id.* The Navy provided General Dynamics with a document containing a three page description of the basic concept. *Id.* As General Dynamics developed the design of the hanger, it provided the Navy with seventy-one pages of detailed working drawings, each of which was

the particular design feature in question there is far from clear. Both the Supreme Court and the Fourth Circuit Court of Appeals sparsely described the design process. *Compare id.* at 509, 108 S.Ct. at 2517 ["Here the state-imposed duty of care that is the asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications.)"] *with Boyle v. United Technologies Corp.*, 792 F.2d 413, 414 (4th Cir.1986), *vacated and remanded on other grounds*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442, *cert. denied*, 488 U.S. 994, 109 S.Ct. 559, 102 L.Ed.2d 585 (1988) ("Sikorsky and the Navy worked together to prepare detailed specifications for the CH–53 helicopter. One of Sikorsky's program engineering managers for the CH–

53 described in some detail the back-and-forth discussions between Sikorsky and the Navy."). Therefore, it is unclear whether the contractor developed the allegedly defective design and it was subsequently accepted by the government or if the government imposed this restriction in design of its own accord. Regardless of who initially developed the design in question, *Boyle* does make it clear that once approved, state-imposed duties have no room to operate, though they may have been a consideration prior to approval. *Boyle*, 487 U.S. at 513, 108 S.Ct. at 2519 (discussing the purpose of warning the government of dangers in the design under consideration).

9. For the purpose of this analysis, the government's approval of a design initiated by the contractor and proposed to the government is also part of the government's involvement in the design process.

signed by a government employee in a box marked "approved." *Trevino,* 865 F.2d at 1477. No other evidence was presented that the Navy further considered the design specifications submitted by General Dynamics. Nor does the case illustrate the basis upon which the Navy's approval was made.

The Fifth Circuit held that the mere signing of a government contractor's design proposal does not present the requisite approval required by *Boyle;* something more than a "rubber stamp" is needed. *Id.* at 1480; *see also Maguire,* 912 F.2d at 71–72 (stating that the "rubber stamp exception ensures that state tort law is not pre-empted absent an actual policy judgment by federal officials"). "When the government merely accepts, without any substantive review or evaluation, decisions made by a government contractor, then the contractor, not the government, is exercising discretion." *Trevino,* 865 F.2d at 1480. The Court held that the government may delegate design discretion to a private contractor; however, when such discretion is delegated, the government can recapture its discretion for *Boyle* purposes only by conducting a substantive review or evaluation of the contractor's proposals. *Id.* at 1480–81, 1485.

■ *Trevino* did little to answer what sort of review or evaluation is sufficient. Limited strictly to its facts, *Trevino* stands for the proposition that the government's merely signing off on a proposed design is not approval for *Boyle* purposes. The government must make some sort of determination that the proposed design complies with its specifications. On the one hand, this review must be more than that involved in choosing stock equipment to meet some governmental need. *Boyle,* 487 U.S. at 509, 108 S.Ct. at 2517. On the other hand, the government does not need to extensively analyze every design proposal for possible safety flaws and then affirmatively choose the design notwithstanding those flaws. *Boyle,* 487 U.S. at 513, 108 S.Ct. at 2519. Not only would such a requirement make a mockery of *Boyle's* third prong, it would effectively emasculate one of the main reasons the government seeks outside contractors in the first place, to tap a talent pool otherwise unavail-

able to it. At a minimum, the government must approve a design proposal based upon the considerations most central to the achievement of its goals, whether they are based upon performance, cost effectiveness, ease of maintenance, or safety. *See id.* at 511, 108 S.Ct. at 2518 (stating that the selection of military equipment "often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness"). These considerations involve the essence of policy making which the government contractor defense was designed to protect. Simply stated, a significant nexus between the policy reasons behind the approval and the particular design configuration being approved must exist. Once the government gives such approval, the contractor's proposed design becomes the government's for purposes of applying the government contractor defense.

■ *Boyle's* third prong requiring that the contractor warn the government of dangers known to it but not known to the government is intimately related to the government's approval of reasonably precise specifications. The Supreme Court stated that this requirement is necessary because, without it, "the displacement of state tort law would create some incentive ... to withhold knowledge of risks." *Id.* at 512, 108 S.Ct. at 2519. It forces contractors that otherwise would not want to disrupt the flow of their contractual obligations to be as up-front as possible about potentially adverse consequences posed by their design proposals. The main purpose of the government contractor defense is to prevent the pass-through of costs that would occur if contractors were held liable for the discretionary acts of the government. *Boyle,* 487 U.S. at 511–12, 108 S.Ct. at 2518–19. If contractors were held liable for acts not truly their own, they would naturally pass these costs on to the government in the form of higher bids. *Id.* It would be ironic indeed if the immunization of contractors from suit provided those same contractors an incentive to produce substandard products for the government. This pass-through cost would be counterintuitive to the

government contractor defense's main purpose. Therefore, *Boyle's* third prong provides a necessary balancing factor to the application of the defense. Though the contractor does not have to propose designs that comply with state law in all respects nor does the government have to accept designs that so comply, the contractor does have a duty to warn the government of potential dangers in the use of the equipment. *See e.g., Carley v. Wheeled Coach*, 991 F.2d 1117, 1127 (3d Cir. 1993) (requiring a "substantial showing that the manufacturer informed the government of known risks in the use of its product"); *In re Joint E. and S. Dist. N.Y. Asbestos Litig.*, 897 F.2d 626, 632 (2d Cir.1989) (stating that *Boyle's* third prong is "geared to ensure that the Government makes its decision to contract for that particular equipment with benefit of full knowledge of all hazards").

■ However, a question exists about the scope of the warning. Feldman argues that the contractor must warn the government of dangers about which it knew *or should have known.* We disagree. In *Bynum v. FMC Corp.*, 770 F.2d 556, 575–76 (5th Cir.1985), a pre-*Boyle* opinion, the Fifth Circuit refused to adopt a "known or should have known" standard. It reasoned that such a standard would increase the costs to the government because a manufacturer would be required to extensively test the equipment and warn the government of defects in the government's specifications. *Id.* at 576. This requirement, the Court reasoned, would go beyond those provided in the contract. *Bynum*, 770 F.2d at 576. However, the Court limited its ruling specifically to the facts before it, finding such a standard was "not warranted here." Following *Boyle*, the Fifth Circuit issued two opinions, delivered the very same day, that address Feldman's precise argument here. In *Smith*, 866 F.2d 135, 139 (5th Cir.1989), the Court arguably insinuated that the knowledge of dangers possessed by the contractor includes not only actual knowledge but also constructive knowledge by stating that the contractor not only did not have actual knowledge but also had "no reason to know" of the danger. This language relates, however, to the testimony of Smith's expert witness who testified that there would have been "no reason to know" of any danger and

does not constitute definitive language broadening the scope of the warnings. Instead, it merely forms the basis for the Court's conclusion that Smith had failed to raise a genuine issue of material fact regarding the contractor's failure to warn the government of dangers of which it had no "actual knowledge."

The Court did specifically address the "known or should have known" argument in *Trevino*, 865 F.2d at 1487, and clarified its usage of the phrase "actual knowledge":

> The district court also held that General Dynamics had failed to prove the final element of the defense, that it had warned the government about the dangers in the use of the equipment that were known to the contractor but not to the United States. The district court committed two errors in this holding. First, it held General Dynamics to a duty to warn the government of dangers about which it 'knew or should have known.' After *Boyle* a government contractor is only responsible for warning the government of dangers about which it has actual knowledge.

Of course, because of the nature of the third prong, the danger foreseeable to the contractor must be such that it was not foreseeable to the government. *See Stout*, 933 F.2d at 336 (stating that the contractor "only had the duty to warn the government of dangers of which the government had no knowledge"); *cf. Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1321 (11th Cir. 1989), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990) (stating that the contractor had no greater knowledge that a condition known both to it and the government posed a greater danger than that known by the government). In other words, the contractor must be in a better position than the government to appreciate the dangers involved because of expertise, experience, or the like. Though this standard may prove hard to apply in practice, it is necessary because of the difficulty in proving actual knowledge of dangers on the part of the contractor. A contractor is not under a duty to warn the government of every potential consequence that could result from the use of

the equipment and to propose a remedy to alleviate those consequences. Such a requirement would prove too onerous to the contractor and could provide a possible end-run around the government contractor defense in all cases. Instead, the contractor must adequately warn the government of dangers such that the government may make an informed choice. A common sense approach suggests that a warning is adequate if the injuries suffered are related to the danger warned about though the specifics of the particular accident were not spelled out in the warning.

 The government contractor defense applies equally to defective design and failure to warn cases. *Id.; Garner v. Santoro,* 865 F.2d 629, 635–36 (5th Cir.1989). The application may be more difficult in failure to warn cases because it is more difficult to show that state law failure to warn claims present significant conflicts with federal policy. *Garner,* 865 F.2d at 635–36. Defective manufacturing claims are not covered by the defense because they violate the second prong of the *Boyle* test, that the defective equipment conform to the government's reasonably precise specifications. *Mitchell v. Lone Star Ammunition, Inc.,* 913 F.2d 242, 248 (5th Cir.1990).

### CLAIMS AGAINST L & M

### Application of Government Contractor Immunity to Sub-contractors

 Feldman asserts that L & M is not entitled to summary judgment as a matter of law because L & M is not a party to a government contract. L & M is in the position of a sub-contractor to EWA as the government contractor. Neither party cites us to case law extending or refusing to extend the defense to a sub-contractor. Based on the policy laid down by the Supreme Court in *Boyle,* however, we conclude as a matter of law that the defense does "trickle down" to sub-contractors. Assume the government contracts with a manufacturer for a particular device consisting of Part A, Part B, and

Part C linked in series. The manufacturer only builds Part B and Part C, so it contracts with a sub-contractor for Part A. The sub-contractor duly notifies the manufacturer and the government that Part A linked in series with Part B and Part C will generate an explosion. The government takes delivery of the device and it explodes, injuring many. The sub-contractor is the defendant in a class action suit containing numerous class members. As a result, the sub-contractor raises the price of Part A to the manufacturer and the manufacturer, accordingly, raises its price to the government. The result is the same as that disapproved by the Supreme Court in *Boyle,* just once removed. Therefore, we hold as a matter of law that a sub-contractor can assert the affirmative defense of government contractor immunity.

### L & M Established the Government Contractor Defense

 Feldman additionally asserts that L & M failed to conclusively prove the government contractor defense.

### 1. Reasonably Precise Specifications Present

Feldman devotes the majority of her argument to an attack on the first prong of *Boyle,* asserting that the government did not provide or approve reasonably precise specifications for the XM09S modification. Feldman presents no controverting witnesses as to the testimony of Toby Brooks or Lawrence Davis, relying instead on other portions of their testimony to show that the government did not provide reasonably precise specifications. These witnesses, with Richard Braun, are the sources for all of the evidence L & M presented with its motion for summary judgment.[10]

It is conclusively established in the record that all decisions with regard to the XM09S modifications were made by a group containing civilians, military personnel, and Davis. This group was dominated by the govern-

---

10. L & M supplemented the appellate record with the motion for summary judgment of EWA, and cites to the contract between ADATS and EWA contained in that motion in its brief on appeal. Because it was not attached as sum-

mary judgment evidence to L & M's motion for summary judgment, or cited therein, we do not consider it on appeal. Tex.R.Civ.P. 166a(c); *see McConnell v. Southside Independent School Dist.,* 858 S.W.2d 337, 341 (Tex.1993).

ment presence, ADATS. ADATS decided whether proposed changes met with the design criteria, and provided design input independent of Davis. The presence and power of ADATS is the most persuasive indicator of the exercise of discretion by the government. This discretion is manifested in the limits placed upon Davis. He had to work with the existing vehicles; he could not even slightly change their appearance so that they maintained their effectiveness as threat simulators; he had to retain the existing Kohler engine; the Kohler engine had to be mounted on slide-out rails for maintenance purposes. The group decided the solution was to install a supplemental radiator. The above criteria dictated that the radiator be mounted horizontally above the Chrysler V–8 and existing radiator, that long hoses run from it to the Kohler engine, and what the size and capacity of the supplemental radiator must be. The design of the radiator was totally dictated by its placement, size, the size of the engine, the operating specifications of the engine, the configuration of the vehicle, and the cooling capacity needed. The record conclusively shows that the group, including ADATS, exercised the discretion, and left Davis and L & M none. The group, including ADATS, dictated requirements such that there was only one device Davis could put in the XM09S to solve the overheating problem, and that was a radiator of a type dictated by other XM09S requirements. Therefore, L & M has conclusively established the first prong of the government contractor defense.

### 2. Compliance With Government Specifications Established

Feldman does not challenge L & M's establishment of the second prong of the government contractor defense in her brief on appeal. The record reflects that the XM09S vehicles were modified according to the plan decided on by the group, including ADATS. Feldman presented no summary judgment evidence controverting the testimony on this point. Therefore, L & M has conclusively established the second prong of the government contractor defense.

### 3. Warning Unnecessary Where Danger Unknown To Contractor

Richard Braun, by affidavit, stated that the only danger regarding the use of the radiator of which L & M was aware was the possibility of hot liquids being expelled from the radiator if the cap were removed when the radiator was hot. He further stated that the government was warned of this danger by a warning printed directly on the attached radiator caps which stated "DO NOT OPEN HOT." Braun specifically testified that L & M was not aware that a radiator cap could be blown off the radiator in the XM09S, or that air locks would build up in the radiator hoses, or that a radiator cap had ever blown off an L & M radiator, and he asserted that a radiator of the type supplied could not build up sufficient pressure to blow off the cap. Feldman presented no summary judgment evidence rebutting L & M's assertion it had no knowledge. The affidavit of Gary Smith alleges that L & M failed to provide adequate warnings, but Smith never asserts that L & M knew or should have known of the potential danger. Because L & M conclusively proved it had no knowledge of the alleged defect, it need not prove the third prong of the *Boyle* test. *See Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19. L & M established all prongs of the *Boyle* test as to Feldman's defective design claim.

### Failure to Warn Claims

 Finally, Feldman argues that L & M failed to prove the government contractor defense as to her failure to warn claims. L & M argues that this assertion of error was not presented in Feldman's response to its motion for summary judgment, and is therefore waived. Examination of Feldman's response to L & M's motion for summary judgment indicates she did not raise this precise argument as to this distinct claim below. Non-movants must present their issues in avoidance of summary judgment in their response to the motion for summary judgment. Tex.R.App.P. 166a(c); *McConnell v. Southside Independent School Dist.,* 858 S.W.2d 337, 341, 343 (Tex.1993); *see City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979). Absent an as-

sertion in a response to motion for summary judgment, the issue in avoidance is waived, and only the sufficiency of the movant's evidence can be challenged. *See McConnell,* 858 S.W.2d at 343. Feldman's response attacked the applicability of the defense generally, however, and we deem this sufficient for the purposes of *McConnell.* Her argument as to a "significant conflict" between federal and Texas law amounts to a misstatement of *Boyle,* but suffices as an attack on L & M's summary judgment as to that claim, on the ground of insufficient proof. It does not constitute a different attack on the summary judgment than asserted below. The "significant conflict" language relied on by Feldman in her argument applies to the *Boyle* test generally, not merely to assertions of failure to warn defects. *See Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518, 101 L.Ed.2d at 457–58.

Failure to warn claims are reviewed under the same *Boyle* test as defective design cases. *Garner,* 865 F.2d at 636. The relevant analysis is whether the warning required by state tort law conflicts with federal policy under *Boyle,* that is, does the government make reasonable specifications as to warnings, are those specifications complied with, and did the contractor warn the government about defects in the specified warnings, if any. *Dorse v. Eagle–Picher Industries, Inc.,* 898 F.2d 1487, 1489–90 (11th Cir. 1990); *Garner,* 865 F.2d at 635–36; *see Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518, 101 L.Ed.2d at 457–58. This is a difficult task for government contractor defendants. *Garner,* 865 F.2d at 635–36. Here, L & M presented no summary judgment evidence supporting a significant conflict between Texas' failure to warn tort law, and the requirements imposed by the government regarding the radiator installed on the XM09S. Specifically, there is no showing that warnings of a particular sort were either required or prohibited, thus a failure of the first prong. The second prong necessarily fails because the first fails, and there is no summary judgment evidence showing that L & M advised the government that the required warnings, if any, were deficient, or that the lack of warnings was dangerous, or that it did not know about dangers a warning would have ameliorated. Therefore, L & M failed to conclu-

sively prove all prongs of the *Boyle* test, and summary judgment cannot be sustained as to Feldman's failure to warn claims.

### *Disposition as to L & M*

The trial court's summary judgment as to Feldman's failure to warn claims is reversed, and the cause remanded for further proceedings. Summary judgment as to her claim of defective design is affirmed.

### *CLAIMS AGAINST EWA*

#### *Application of the Boyle Test*

█ Feldman asserts that EWA's summary judgment evidence does not establish any part of the *Boyle* test. We analyze each element in turn. With regard to the first element and largely based upon *Boyle* and *Trevino,* Feldman has identified three situations in which a *Boyle* analysis may be conducted. According to Feldman, the government contractor defense is appropriate if the government has provided an express and precise delineation of exact design specifications, or it has been involved extensively in the design process, or it has engaged in a substantive review and evaluation of design proposals. These situations present decreasing levels of government involvement in the design of procured equipment. Feldman asserts that the government's involvement in this case fell somewhat below these situations and was a mere "rubber stamp" of EWA's design recommendations. She argues that EWA had ample room to exercise discretion within the constraints imposed by ADATS and the physical characteristics of the XM09S. We disagree.

Feldman's argument depends on a very narrow view of EWA's, and more particularly, Davis' role in the design of the modified cooling system. In substance, she would have us believe that any unreviewed exercise of discretion on the contractor's part eliminates the government contractor defense. However, *Boyle* expressly rejected this view. In discussing a proposed test that would apply the defense only if the contractor did not participate or participated only minimally in the design process, the Court held that the "design ultimately selected may well reflect a

significant policy judgment by Government officials whether or not the contractor rather than those officials developed the design." *Boyle,* 487 U.S. at 513, 108 S.Ct. at 2518. It then stated that "it does not seem to us sound policy to penalize, and thus deter, active contractor participation in the design process, placing the contractor at risk unless it identifies all design defects." *Id; see also Maguire,* 912 F.2d at 72 n. 2 (holding that the "mere fact that a design proposal originates with the government contractor is not enough to make the defense inapplicable"). In the design process, decisions about design may be made by the government, the contractor, or by both. However, this situation should not cloud the ultimate inquiry—whether the government made an informed choice. *See Boyle,* 487 U.S. at 513, 108 S.Ct. at 2518; *Trevino,* 865 F.2d at 1480–81 ("At a minimum, the federal officer approving the design must not only sign it but know what is there."). And this choice is ultimately driven by the policy considerations animating the government's actions.

EWA was retained to solve the overheating problem in the XM09S, and its engineer, Davis, was assigned the task of troubleshooting this problem. He presented various proposals to a group made up of government and civilian members. This group made the ultimate decision as to which proposal was implemented; not Davis, and not EWA. Furthermore, ADATS, the government player in this process, held the trump card. It expressly rejected at least three proposals based on its overriding policy considerations. No reconfiguration of the cooling system that entailed the slightest profile change in the system or that exceeded certain cost measurements was accepted. It accepted the only proposal that fit within those strict parameters. This type of back and forth problem solving and the severe nature of the constraints placed on EWA clearly satisfy *Boyles'* first prong and illustrate that the government approved the design proposed by Davis based on legitimate policy considerations involving cost effectiveness, performance, and ease of maintenance. The government knew enough about the proposed design to see that it met its needs and its approval was no "rubber stamp." Furthermore, we are of the opinion that if "approval" as defined by *Boyle* and *Trevino* calls for the type of telescoping-in on decisions made exclusively by a contractor as Feldman suggests, the constraints imposed by ADATS on EWA were so severe that no meaningful exercise of discretion could be exercised on their part.[11] Therefore, we hold that the first prong of EWA's government contractor defense has been proved as a matter of law.

The second prong of the *Boyle* test requires conformity between the equipment and the reasonably precise specifications approved by the government. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19; *see also Landgraf v. McDonnell Douglas Helicopter Co.,* 993 F.2d 558, 560–62 (6th Cir.1993) (applying *Boyle's* second prong). Feldman does not challenge EWA's establishment of this prong and the record reflects that the XM09S vehicles were modified according to the plan approved by the group, including ADATS. Feldman presented no summary judgment evidence controverting the testimony on this point and EWA has conclusively established the second prong of the government contractor defense.

The third *Boyle* prong requires the contractor to warn the government of defects known to it but not to the government. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19. This prong insures that no incentive exists on the part of the contractor to keep silent about defects it knows about while under the umbrella of the government's immunity. *Boyle,* 487 U.S. at 512, 108 S.Ct. at 2518–19. The record clearly shows that Davis, and by implication EWA, knew of the potential the long hoses created for air locks to form and the potential danger posed by them. However, the record fails to establish that Davis

11. At least one Court has suggested in dicta a willingness to take this view. In *Mitchell v. Lone Star Ammunition, Inc.,* 913 F.2d 242 (5th Cir. 1990), the Fifth Circuit stated that "the defense possibly applies, as well, where because of government requirements a product is designed not as defective, but nonetheless as dangerous, and could not serve its intended purpose if it were 'safe' in the sense that a consumer-oriented product would be expected to be safe." *Id.* at 245 n. 4.

apprised the government of this problem. His specific testimony follows:

Q: Do you remember the configuration of the hoses that were connected to that engine and that radiator?

A: Vaguely I remember them, and I remember they were very long. And they had to be carefully stowed, and you had to be careful when you pulled the vehicle out. My recommendation was to never try to pull the vehicle out while the engine was hot and to stow the long radiator hoses in a position which would try to prevent, or would prevent if they were stowed correctly, any air locks or this sort of thing because air lock is common if you don't keep the vehicle or the radiator and the cylinder block and everything completely full of water at all times. If you keep them completely full of water, they generally won't air lock. It's just like your automobile. If you let the radiator run low, you could get an air lock in your cooling system.

. . . . .

Q: Did you believe at the time the L & M radiator was installed that the length of the hoses posed a potential air-lock problem in this system?

A: Well, potential, yes. But if they were properly stowed, and the system was properly maintained, kept full of coolant, it could have been avoided, yeah.

Q: Was it a foreseeable potential problem that you, as a mechanical engineer, could foresee?

A: Yeah, you have to foresee that there was a potential problem in the absence of proper care and maintenance.

Q: Did you propose any warnings to be placed on the system where the personnel would be able to read a warning about placement of the hoses? Did you propose anything like that?

A: I don't recall having specifically proposed it, but the head of safety there, I think was an RCA safety man, and we discussed this. Whether or not one was put on there—I did warn the operators and the safety man that

they should be careful about handling this thing with those long hoses on there.

. . . . .

Q: While you were at EWA, were there any written warnings or instructions put on the machine regarding the use of the hoses or the way they were stored?

A: I don't recall whether I wrote anything in my notes or not, but they were discussed.

Q: Based on your experience with this particular machine, do you believe the mechanics, the people that would work on the radiator and Kohler generator, should have been informed about potential air-lock dangers with the hoses?

A: I assume that's a part of training of people that are going to work with a machine, which would have been, I guess, ADATS, army, RCA, at that time, their responsibility to train their people to operate, what had to be done to operate the machine. You have to have training to drive an automobile. Anything requires some competence on the part of the people that are using it.

Q: Yes, sir, but I want to talk specifically about these long hoses. This was not a typical design; it was atypical to the extent that you had these long hoses and two radiators on top of each other, right?

A: Yeah. I'd say it was atypical. It was atypical by virtue of constraints.

Davis also testified that he had no specific contact person at ADATS. At best, he relayed his concerns of the air lock dangers to "the safety man" who by his own recollection worked for RCA, not ADATS, the Army or the government. Furthermore, the facts that air locks frequently formed in the cooling system, that overheating continued to be a problem with the XM09S, and that a pressure release valve was added to the system after the accident all suggest that the government was not adequately warned. At the very least, they present fact issues with re-

gard to the establishment of *Boyle's* third prong. Feldman's point of error is sustained and the case is remanded to the district court for a determination of whether the air locks posed a danger foreseeable to EWA, whether EWA adequately warned the government of that danger, and whether EWA adequately instructed the government on the appropriate care and maintenance of the system to prevent that danger.

### Failure to Warn

■ Feldman further asserts that EWA failed to prove the government contractor defense as to her failure to warn claims. We reiterate here that failure to warn claims are reviewed under the same *Boyle* test as defective design cases. *See Garner v. Santoro*, 865 F.2d 629, 636 (5th Cir.1989); *In re Joint E. and S. Dist. N.Y. Asbestos Litig.*, 897 F.2d at 630 and n. 4. The relevant analysis is whether the warning required by state tort law conflicts with federal policy under *Boyle*, that is, did the government make reasonable specifications as to warnings, are those specifications complied with, and did the contractor warn the government about defects in the specified warnings, if any. *Dorse v. Eagle–Picher Industries, Inc.*, 898 F.2d 1487, 1489–90 (11th Cir.1990); *Garner*, 865 F.2d at 635–36; *see Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518–19. Here, EWA presented no summary judgment evidence supporting a significant conflict between Texas' failure to warn tort law and the requirements imposed by the government regarding the radiator installed on the XM09S. Specifically, no showing was given that warnings of a particular sort were either required or prohibited. Thus, the first prong fails. The second prong necessarily fails because the first fails. Finally, with regard to the third prong, no summary judgment evidence exists showing that EWA advised the government that the required warnings, if any, were deficient, or that the lack of warnings was dangerous. Therefore, EWA failed to conclusively prove all prongs of the *Boyle* test, and summary judgment cannot be sustained as to Feldman's failure to warn claims.

### Disposition as to EWA

Summary judgment in favor of EWA is reversed and remanded for further proceedings.

### CLAIMS AGAINST STANT

■ Stant sought summary judgment on Feldman's claims based on the assertion that Feldman presented no evidence that Stant manufactured the radiator cap in question. Central to Stant's assertion is the fact that Feldman could not produce the actual radiator cap. However, Feldman's claims do not depend on the actual production of the allegedly defective product; they may be proved with circumstantial evidence. *See Bell Aerospace Corp. v. Anderson*, 478 S.W.2d 191, 196–97 (Tex.Civ.App.—El Paso 1972, writ ref'd n.r.e.); *see also El Paso Natural Gas Co. v. Harris*, 436 S.W.2d 408, 411 (Tex.Civ.App.—El Paso 1968, writ ref'd n.r.e.); *Del Camino Courts, Inc. v. Curtice*, 323 S.W.2d 355, 359 (Tex.Civ.App.—El Paso 1959, no writ); *J.H. Robinson Truck Lines, Inc. v. Raymondville Indep. School Dist.*, 237 S.W.2d 359, 360 (Tex.Civ.App.—El Paso 1950, no writ). Stant argues that there is no evidence that Stant manufactured the cap or that the cap was defective. We disagree on both counts. The summary judgment record reveals that Feldman testified that the radiator cap in question said "Stant" on top of it, that she never saw the XM09S with any radiator cap other than a Stant, and that she knew what type of cap was utilized because she routinely picked them up from logistics. Although she knew that Stant manufactured the cap in question, she did not know the specific type or serial number. Brooks testified that he assumed the radiator cap was a Stant because that was the brand logistics always purchased. This constitutes some evidence that Stant did in fact manufacture the radiator cap, thus raising a factual issue.

Notwithstanding Feldman's possible ability to establish that Stant did in fact produce the radiator cap in question, she must still present a fact issue as to whether the cap contained a defect. *See Rodriguez v. Ed Hicks Imports*, 767 S.W.2d 187, 192 (Tex.App.—Corpus Cristi 1989, no writ) (holding that the plaintiff presented no evidence demonstrat-

ing that the radiator cap contained a defect). As stated above, a fact issue as to whether the cap contained a defect may be raised with circumstantial evidence. The summary judgment evidence contains testimony by Brooks concerning his assumption that two things happened to cause the explosion: one, that the radiator cap bent and the other, that the neck of the radiator itself bent. Following the accident, the radiator had to be straightened with a hammer so that it would hook into the safety on the new radiator cap. This assertion raises a fact issue as to whether the cap contained a defect and precludes summary judgment.

### DISPOSITION AS TO STANT

Therefore, we affirm Feldman's point of error and reverse and remand to the district court for trial on the claims against Stant.

### CLAIMS AGAINST KOHLER

█ Kohler moved for summary judgment based on the assertion that it did not manufacture the radiator or the radiator cap, it did not place the allegedly defective product into the stream of commerce, and that as a matter of law it could not be held responsible for the acts or omissions of the manufacturer of an interchangeable part. This assertion misconstrues Feldman's claims, which encompass not only the radiator and the radiator cap, but also the generator set manufactured by Kohler. It is impossible to tell from the record whether the defects complained about stop at the radiator and the radiator cap, or if they extend to the generator system as a whole. In fact, Feldman testified that at the time of the accident, the generator was overheating. Brooks testified that the generator would overheat and the mechanics would "shut it down, wiggle the hoses, remove the [radiator] cap, try to add more water." When asked what happened immediately before the accident, he clarified that it was the generator, and not the radiator, that was overheating. The record also reflects that a safety valve, called a petcock,

was installed on the generator some three months after the accident.[12]

█ In support of its motion, Kohler attached the affidavit of Alan Wilson, indicating that the generator in question was manufactured as a set incorporating a radiator and radiator cap manufactured by Perfex. Wilson additionally stated that he was not aware of any communication or correspondence involving Kohler or an employee, agent, or representative of Kohler which would have discussed utilizing the generator in the XM09S system or changes or modifications in the product for purposes of the system. We note, however, that an integral unit need not be unchanged between delivery and injury in order to impose strict liability upon the manufacturer. It is sufficient that the product receive only the use and alteration which might reasonably have been foreseen or anticipated. *Dion v. Ford Motor Co.,* 804 S.W.2d 302, 307–08 (Tex.App.—Eastland 1991, writ denied); *Sharp v. Chrysler Corp.,* 432 S.W.2d 131, 136 (Tex.Civ.App.—Houston [14th Dist.] 1968, writ ref'd n.r.e.). Kohler offered no summary judgment evidence that the replacement of the radiator or radiator cap was not reasonably foreseeable. In fact, Brooks testified that General Electric possessed in its files a letter from another company indicating it had begun using a fifteen-pound radiator cap rather than the standard seven-pound cap on the advice of Tristate Equipment Company, the Kohler representative with which General Electric had dealt. The purpose of changing the radiator cap was to solve the overheating problem.[13]

### DISPOSITION AS TO KOHLER

Accordingly, Feldman's complaint is sustained and the case is reversed and remanded as it relates to the claims against Kohler.

### CONCLUSION

We reverse and remand the summary judgments entered in favor of EWA, Stant,

---

12. Although generally speaking, subsequent remedial measures are not admissible to prove negligence, an exception is provided for its admission in products liability cases based on strict liability. Tex.R.Civ.Evid. 407(a).

13. Brooks testified that the specific representation was "Well, if you put a 15–pound cap on, it just allows you to run it with a little more heat."

and Kohler. We affirm the summary judgment granted in favor of L & M as to design defects and reverse and remand with regard to Feldman's failure to warn claims.